## HELEN M. PATTON v. MORRIN-POWERS MERCANTILE COMPANY, Appellant.

### Division One, November 30, 1910.

1. **DEMURRER TO EVIDENCE: Effect.** The function of a demurrer to the evidence is to admit as true all the facts which the evidence tends to prove, as well as all reasonable deductions which may be naturally drawn therefrom.

2. **NEGLIGENCE: Wagon Driver: Demurrer: Prima Facie Case: Nonsuit.** Plaintiff, a lady seventy-five years old, of unusual vigor and with good eyes, was knocked down and trampled upon by a horse driven by an employee of defendant mercantile corporation, as she was attempting to cross a street at a crossing. She alighted from a street car about seventy-five feet west of the north-and-south street, and, after looking for approaching vehicles and seeing none, started northerly across the east-and-west street, to its north side, for the purpose of taking a south-bound car; a few feet north of the track, defendant's servant, in charge of a horse and wagon, in a half-intoxicated condition, with whip raised, drove down the east-and-west street, in a brisk trot, ran his horse against her, knocked her down and inflicted serious injuries; when within a few feet of her he shouted, "Get out of the way there," and did not make any attempt to stop or slacken his speed until the horse was upon her; the street was a principal thoroughfare of the city, along which was a great deal of travel in street cars, vehicles and on foot; and the same horse almost ran over a man, and would have done so had the man not placed his hand against the horse and pushed himself back, being thrown to his knees in so doing. *Held*, that plaintiff made out a prima facie case, and the court erred in sustaining a demurrer to the evidence and in compelling her to take a nonsuit, and did not err in setting aside that order and granting a new trial.

3. ———: ———: **Contributory Negligence: Constant Lookout.** All the law requires of a pedestrian crossing a street is that she exercise ordinary care in looking for an approaching wagon. Where the plaintiff alighted from a street car, and, before attempting to cross the tracks, looked for approaching vehicles and saw none, the law does not require her to constantly look out for them while she is crossing the street; and the court cannot declare, as a matter of law, that she was guilty of contributory negligence because she did not; whether she exercised ordinary care was, under the circumstances, a question for the jury.

Appeal from Jackson Circuit Court.—*Hon. Hermann Brumback,* Judge.

AFFIRMED.

*Stewart Taylor* for appellant.

(1) Where plaintiff's own evidence shows such contributory negligence as to defeat his right of action, it is the duty of the trial court to so declare as a matter of law. Hudson v. Railroad, 101 Mo. 13; Corcoran v. Railroad, 105 Mo. 399; Hudson v. Railroad, 123 Mo. 445; Sindlinger v. City of Kansas, 126 Mo. 315; Barton v. Railroad, 52 Mo. 258; Weber v. Railroad, 100 Mo. 194; Powell v. Railroad, 76 Mo. 80; Wendall v. Railroad, 100 Mo. App. 562; Hogan v. Railroad, 150 Mo. 36; Roberts v. Telephone Co., 166 Mo. 370; Cohn v. City of Kansas, 108 Mo. 393; Holwerson v. Railroad, 157 Mo. 216; Wheat v. St. Louis, 179 Mo. 572; Erickson v. Railroad, 171 Mo. 647; Evans v. Railroad, 178 Mo. 508; McGee v. Railroad, 214 Mo. 546; Meyer v. Railroad, 6 Mo. App. 27; Barker v. Savage, 45 N. Y. 191; Messenger v. Dennie, 137 Mass. 197; Yore v. Transfer Co., 147 Mo. 679; Woodson v. Railroad, 224 Mo. 685; Butts v. Railroad, 98 Mo. 272. "In that case the court does not weigh the plaintiff's evidence of defendant's negligence, and pronounce it insufficient, but it takes the plaintiff's evidence of his own negligence, at its face value, and passes judgment of nonsuit upon it." Schmidt v. Railroad, 149 Mo. 287; Sims v. Railroad, 116 Mo. App. 579. (2) There was no proof of the specific act of negligence charged. McGrath v. Railroad, 197 Mo. 105; Hafner v. Railroad, 197 Mo. 202; Boring v. Railroad, 194 Mo. 552; Roscoe v. Railroad, 202 Mo. 587. (3) No inference of defendant's negligence arises from the fact that there was a collision in which plaintiff was injured. Lee v. Jones, 181 Mo. 291; Yore v. Transfer Co., 147 Mo. 679. (4) There is no evidence that the plaintiff was or could have been seen in a

position of peril in time by the exercise of ordinary care to have averted the injury.   Prewitt v. Eddy, 115 Mo. 283; Rissler v. Railroad, 113 Mo. App. 126; Roenfeldt v. Railroad, 180 Mo. 554; Sites v. Knott, 197 Mo. 684; Lennon v. Railroad, 198 Mo. 514; Reno v. Railroad, 180 Mo. l. c. 485; Ries v. Railroad, 179 Mo. 1; Yancey v. Railroad, 93 Mo. 433.   (5) There is no plea nor proof that the defendant willfully and wantonly ran into the plaintiff.   Guyer v. Railroad, 174 Mo. 344; Van Bach v. Railroad, 171 Mo. 338; Tanner v. Railroad, 161 Mo. 497; Holwerson v. Railroad, 157 Mo. 216.   (6) The fact, undisputed, that the horse stopped the instant plaintiff collided with his left shoulder, is proof conclusive that it could not have been going at high speed just before plaintiff took the last step. This fact overcomes any possible testimony as to negligent rate of speed. McCreery v. Railroad, 221 Mo. 18. It is well settled that courts will not stultify themselves by giving any heed to the testimony of witnesses, or the inferences deducible therefrom that are so opposed to all natural law and reasonable probability as to be manifestly false. Gurley v. Railroad, 104 Mo. 233; Dunphy v. Stock Yards, 118 Mo. App. 522; Demaet v. Storage Co., 121 Mo. App. 103; Payne v. Railroad, 136 Mo. 575; Baker v. Railroad, 122 Mo. 593; Weaver v. Railroad, 60 Mo. App. 207.   (7) The plaintiff had no right to be "oblivious to her surroundings" while crossing the street, but should have been on the lookout for approaching vehicles.   All she had to do was to use her senses and the accident would have been avoided.   Her eyesight and hearing were not defective.   Waddell v. Railroad, 113 Mo. App. 684; Wheat v. St. Louis, 179 Mo. 580; Schmidt v. Railroad, 191 Mo. 234; Kelsay v. Railroad, 129 Mo. 375; Barker v. Savage, 45 N. Y. 191; Groom v. Kavanagh, 97 Mo. App. 372; Payne v. Railroad, 136 Mo. 586.

*Rush L. Fisette* and *Bird & Pope* for respondent.

(1) Plaintiff did not, as a matter of law, have to look for the wagon of defendant, or, on her failure so to do, stand 'convicted of contributory negligence. Dahlstrom v. Railroad, 108 Mo. 525; Baker v. Railroad, 147 Mo. 140; Cook v. Railroad, 19 Mo. App. 329; Hennessey v. Taylor, 189 Mass. 583; Schramm v. Parker, 72 N. J. L. 243; McCrohan v. Davidson, 187 Mass. 466. (2) The plaintiff can recover if defendant, by the exercise of ordinary care, could have avoided the injury, or if the defendant was so reckless that by the exercise of ordinary care it could not have avoided the injury. Dunkman v. Railroad, 95 Mo. 244; Hogan v. Railroad, 150 Mo. 54; Klockenbrink v. Railroad, 172 Mo. 687. (3) Expert evidence is not admissible as to the time or space in which the horse and wagon ought to have been stopped. Express Co. v. Kinnare, 168 Ill. 643; O'Neill v. Railroad, 129 N. Y. 125. If, as stated by Mr. Justice Earl in this New York case, jurors are generally well acquainted with such common things as trucks and horses, and the power, action and capacity of horses, then in such a case the jurors were capable of forming an opinion on the matter from all the facts, and expert evidence was not admissible, in this State, under the following authorities: Koenig v. Railroad, 173 Mo. 698; Rosenkranz v. Railroad, 109 Mo. 9; Gavish v. Railroad, 49 Mo. 274; Meng v. Railroad, 108 Mo. App. 553; Naughton v. Stagg, 4 Mo. App. 271; Gutridge v. Railroad, 94 Mo. 568; Rosenheim v. Ins. Co., 33 Mo. 230; Limberg v. L. Co., 127 Cal. 598. And see cases under division 4. (4) Expert evidence, even if proper, was unnecessary in this case, for the jury, from the facts, were capable of forming a correct conclusion. Holden v. Railroad, 177 Mo. 470; Shanks v. Railroad, 101 Mo. App. 702; Barrie v. Railroad, 102 Mo. App. 87; Jersey Dairy v. Railroad, 103 Mo. App. 90; Linder v. Railroad, 103 Mo. App. 574; Moritz v.

Railroad, 102 Mo. App. 657; Kimble v. Railroad, 108 Mo. App. 78. (5) Contributory negligence does not bar a recovery where the conduct of the defendant is reckless or wanton, as in this case. Kellny v. Railroad, 101 Mo. 67; Morgan v. Railroad, 159 Mo. 262; Mayes v. Railroad, 121 Mo. App. 614; Cole v. Railroad, 121 Mo. App. 605; 1 Thomp. on Negl., sec. 206; Thompson v. Livery Co., 214 Mo. 487.

WOODSON, J.—The plaintiff, a lady, seventy-three years of age, was knocked down and trampled upon by a horse, driven by an employee of defendant, on one of the public streets of Kansas City. Her injuries were quite serious, and she instituted this suit to recover the sum of $10,000 damages of defendant on account of those injuries, alleged to have been inflicted through the alleged negligence of said employee.

The defendant was engaged in the mercantile business in said city, and said employee was at the time of the injury engaged in delivering goods for the defendant.

At the close of plaintiff's evidence, the court announced that it would give an instruction in the nature of a demurrer to the evidence, telling the jury that plaintiff was not entitled to a recovery, to which action of the court plaintiff duly objected and excepted; and, thereupon, she took a nonsuit with leave to move to set aside the same. In due time counsel for plaintiff filed a motion to set aside the nonsuit, and asking for a new trial. After due consideration the court, without assigning any reason therefor, sustained said motion; and to the action of the court in so ordering, the defendant properly excepted, and in due time appealed therefrom to this court.

The facts of the case as disclosed by the record are few and practically undisputed. Plaintiff's evidence tended to prove that on October 11, 1905, in the afternoon, she, a woman of seventy-three years of age and

of unusual vigor and good health for one of her years, left her home in Rosedale, Kansas, on a street car, for the purpose of visiting her daughter, who resided near the south end of the Roanoke car line, in Westport. She took the Rosedale car in Rosedale, intending to transfer to a Roanoke car, south-bound, at Summit street, Kansas City, Missouri.  She left the Rosedale car about 4:45 p. m. on Southwest boulevard, about seventy-five feet west of Summit street, the point where the car stopped for passengers to alight, and was crossing on said boulevard in a northerly direction for the purpose of taking a Roanoke car at the northwest corner of said boulevard and street. She had crossed north over both car tracks and was a few feet north of the north rail of the north track when knocked down, run over and injured by defendant's horse and wagon.  The plaintiff was perfectly familiar with the situation, having made this same trip numerous times, and almost every week.  The place of the injury was at a regular transfer point for street car passengers.  At the time of the catastrophe there was a heavy traffic on Southwest boulevard, also a heavy transfer of passengers at the intersection of Summit street and said boulevard—the cars of three lines were passing over the tracks of the Summit street line.

While the court assigned no ground for sustaining the demurrer to the evidence, however counsel for defendant in their briefs contend that the court properly sustained the demurrer, or rather indicated that it would do so, for two reasons: First, because the evidence did not make a case for the jury; and, second, because the evidence conclusively showed that plaintiff was guilty of such contributory negligence as should bar a recovery.  It, therefore, becomes necessary for us to briefly state the evidence introduced bearing upon those questions.

John Pryor testified that what first attracted his attention was the driver going across the street car

tracks in Summit street; that he went across at a pretty good gait; that he saw the horse before it struck the plaintiff; that he saw the horse as it "ran upon the old lady;" "that up to the time it struck the plaintiff he did not notice that the speed of the horse was checked;" that the impact with the horse knocked the plaintiff to the ground on her side, and the horse was standing kind of over her; straddle of her; that there was a man (James H. Gilkey) ahead of the horse, who threw up his hand, and the horse came very near touching him; that he did not think it touched him; that he never saw the plaintiff when he saw the man ahead of the horse; that after plaintiff was struck and thrown to the pavement she was headed west; that the horse was going at a pretty good gait; and by that he meant the driver was driving at a pretty fast trot.

Mattie Stevens testified that the plaintiff got off of a Rosedale car and started north across the Southwest boulevard; that she noticed her very particularly; that plaintiff had "gotten across both tracks and was going straight to the sidewalk" on the north side of the street, and the "horse and wagon ran right into her" and knocked her down; . . . "that after she fell the fellow (driver) grabbed back on the horse like that (illustrating) and the horse trampled all over her:" that "just about the time the horse hit her, the driver hollered, 'Get out of the way there;' that she did not see the driver do anything except pull back on the lines; that the plaintiff's clothing were all dirt and dust and torn; that the horse's hoofs had ground holes in her garments, and a piece of her clothing, about that long (indicating) was torn nearly off and hung by the edge;" . . . that she could tell when a person had imbibed liquor to excess; that the "driver was more than half intoxicated, too much so to be on a public wagon; that his eye-balls were red and his tongue thick," and his breath smelt of "bad whiskey;" that she did not see the driver before he crossed the

car tracks in Summit street, and "then he was just coming at full speed; he didn't make any halt whatever;" that she had crossed both tracks, and had gotten across the second or north track about two or three feet; that she fell towards Rosedale; her head fell that way; right straight with the tracks going west, and straight with the horse's head; that she fell full length; that the horse seemed to be standing on her stomach, but he was on her clothing; she did not know whether he was on her body or not.

On cross-examination: "Q. Did you see her the instant she fell? A. Yes, sir. Q. Which direction was she going then? Like this (indicating), facing north? A. Her face was that way, yes, sir. Q. Did she look towards the east at any time? A. Why, she saw the wagon right on her, and just did that way (indicating with her hands) and fell. Q. But she didn't see the wagon until it was right on her? A. I couldn't say whether she did or not; I wasn't using her eyes. Q. You were telling about what she was doing; you didn't see her look towards the east to see if a car or wagon was coming? A. No, sir; I don't remember anything about that at all." That plaintiff's left side struck the pavement; that she first saw the horse and wagon just as it bounced across the Summit street car tracks; that there is a good deal of travel there, but never any rush; no fast traffic along there; that wagons usually slack up a little at transfer points and crossings; that she did not notice the driver particularly before the horse struck the plaintiff. "Q. Now, did you or did you not say you noticed him continuously from the crossing of Summit street until his horse struck her? A. He was right in front of my eyes driving that way. I don't know that I had my eyes set right on him. Q. Did you or did you not watch him continuously from the time he crossed the Summit street tracks until he struck the plaintiff? A. Yes,

sir; I saw him from the time he crossed the track until he struck her. Q. Did you watch him continuously? A. I couldn't say I did, but I saw him. Q. You saw him crossing the Summit street tracks, you tell us, and you saw him when his horse struck the old lady; now, did you see him between those times. A. Well, there was nothing to see between the time he drove across the track and when he struck her; it wasn't more than three or four seconds." That she would have run and grabbed the plaintiff out of the way if she would have had time. "Q. Did you notice that she was in danger? A. I saw he was going to run into her, and he hollered, 'Get out of the way, there.' Q. When did you see he was going to run into her? A. Just about the time he was going to run into her." That she saw the plaintiff just before she was struck, and the plaintiff threw up her hands like that (indicating); that she did not know whether a car was passing on the north track or any other wagon in the street at or about the moment the plaintiff was struck.

James H. Gilkey testified that he was right where the horse came along, and had his hand on the horse or he would have been caught too. "Q. What effect did it have on you when you put your hand on the horse? A. It knocked me down; I fell on my knees, but I jumped up again. The team was coming this way. It came with force, very fast, and I seen it was going to hit me, and I jumped back and put my hand against the horse and it threw me down on my knees and I jumped up. And when I jumped up the old lady was lying down and the horse standing on her with one foot. Q. Now, you say this horse was coming fast; can you give the jury any idea of about how fast it was coming? A. It was coming pretty fast, for the man that was on the wagon was holding his whip up and that made the horse run faster, and it ran on her, and would have run on me, but I put my hand against the horse and fell down on my knees. And I ran and tried

to get the horse off of her, but another man got there before me." That he got off of a Rosedale car and was going to take a south-bound Roanoke car; that the first thing he saw was the driver with his whip up, and the horse was going awful fast; that when he first saw the horse it was about as far "as from here to that iron railing there" (indicating) about fifteen feet. "Q. Fifteen feet is the distance that the wagon was away when you first saw it, is that right? A. I think so." That he would be seventy-three years old in July; and was a little slow on his legs, and a little hard of hearing, but his eyesight was good; that he touched the horse on the left shoulder, and fell back kind of sideways; that the plaintiff was beside him and on his left, and the horse went on and hit her; that they had to cross over the Southwest boulevard tracks to get to the Roanoke car; that there was no sidewalk to cross on to get there, and they had to cross the way they did; that it was a couple of car-lengths (60 feet) from the Summit street car tracks to where they got off the Rosedale car, but he did not think it was one hundred feet; that he saw the horse standing with his left forefoot on the plaintiff, on her side, and the other foot on the ground, and the plaintiff was lying there on her back; that the left fore-foot of the horse was on the side of the plaintiff, or it seemed to him that way; that the plaintiff was walking a little piece from him, three or four feet; that she did not go around behind the car she got off of; the car had gone on; that the plaintiff was three or four feet from him, and the horse was lunging when he touched him.

Plaintiff testified that she was not acquainted with Mrs. Mattie Stevens, the witness who saw her struck by the horse and wagon, before she was hurt. "Q. (By Mr. Bird): You remember sending it (a transfer) to me at my house? A. Yes, sir; I had it in my pocket-book ever since. But I can't tell you any more after I got out and went around the street car; then I can't

remember anything. Then I expect the boy struck me, but I can't remember anything else. Q. Have you any recollection of the horse striking you? A. No, sir; I never knew what happened to me if they hadn't told me." That she had gone over that route about every week; that she crossed over the street that day the same as she had done once a week, and as everyone else did, if they wanted to catch a south-bound Roanoke car, that her eyesight was good; that her injuries were in her left side and in the back part of her head; that her left eye was all right before the injury, but her right eye had been weak for ten years before she was hurt; that after the injury she noticed that she was forgetful and could not remember as well as she could before.

On cross-examination: "Q. (By Mr. Taylor): Isn't it a dangerous thing for almost anyone to come down town with these crowded streets and street cars? A. I wouldn't say that, for I did." That she was thrown on the side of her face; that she thought she was across the car tracks in the Southwest boulevard, but she could not tell; she thought she had gotten pretty nearly to the sidewalk, but she did not know where she was struck; that she got across the tracks; that she did not see the horse or the man (Gilkey.) "Q. Do you know whether you stopped on the north track to look for a car coming from the east? A. I always stand there when I get off the car. I always look before I start across the track. Q. And you think you looked at that time? A. Yes, sir. Q. And you stopped while you were looking, did you? A. I don't think I stopped. I could see without stopping. Q. Why was it when you were looking for the car you did not see this horse and wagon coming? A. I don't know. He must have come like a whirlwind. Q. Your hearing is good, Mrs. Patton? A. Yes, sir. Q. And you could have heard him if he was coming like a whirlwind? A. Yes, sir; I could. Q. Did you notice whether there were any wagons on

the north side of the street there? A. No, sir; I don't think I did. I wasn't thinking about that; I was only thinking of where I was going, and I didn't think there was anything to hurt me. Q. And were you in a hurry to go where you were going when you got off of the car? A. Nothing more than usual. Q. Didn't you testify in your direct examination that you were in a hurry when you started across the street? A. I didn't think there was anything to hurt me when I started across the street. Q. The question I asked you is, whether you did not testify, in answer to Mr. Bird's question, that when you got off this car and started across the street it was late and you were in a hurry to get to your destination? A. I expect I was. Q. You were in a hurry then when you were crossing these tracks, just before you were run into by this horse? A. I am always in a hurry going any place, and I remember well of getting off the car and going across the street car tracks, and that is all I do remember. Q. You were not looking for the horse then? A. I was looking for the horse if there had been any in my sight." That she did not think she had a veil on. "Q. Were you on the track, or was it just before you got on the track, on the north track, that you looked east and stopped to see if there was a car coming from down town? A. Yes, sir; I always do that. Q. Then you started on. Now, did you look again after you got off the track, or did you keep your face straight to the north in the direction you were going? A. I expect I looked straight ahead, but if there had been a wagon close to me, I would have seen it, and heard it too." That there was no wagon coming that she saw, and if the wagon was coming it was coming as fast as it could, or she would have noticed it; that the Rosedale car had moved on before she saw whether there was another car coming; sometimes the cars meet right there. "Q. Did you look to see whether any wagons were coming after you had stepped on the track? A. I reckon I did,

because I always looked." That the horse stepped on her side; "I think his foot stepped on my side and slipped off; I don't know anything about it; I can't tell you. I don't know anything more about that than you do now. I never knew anything after I started to cross the street; after it struck me I didn't know anything;" that she did not think the horse would have struck her at all if the driver had been attending to his business.

In regard to the distance in which the driver ought to have stopped the horse and wagon, John Pryor, who had been a teamster for eight years, and who claimed to be an expert driver, testified that the horse was going at a pretty good gait, and by that he meant the driver was driving the horse at a pretty fast trot, and that he was going that same gait just before he hit the plaintiff; that there is a water grade on the Southwest boulevard at that point, sloping to the west, but the grade there was not very much of a one. And the witness, after being qualified, was asked and answered the following questions: "Q. Now, taking that grade, and assuming that the load in the wagon was over two thousand pounds, and that the horse weighed no more than eleven hundred and twenty pounds, would it be possible to stop with that load in that wagon when going at such a rate of speed as you say he went across Summit street, and stop in within two feet? A. Yes, sir; with a one-horse wagon that way. Q. How would he do it? A. Throw on your brake and pull down on your lines. Q. Now, Mr. Pryor, when a man could do that, it would be some evidence that he had his horse under pretty good control, wouldn't it? A. Yes, sir; certainly. Q. The fact that he could stop after knocking a person down, and stop his horse right over him, would be evidence that he had complete control of his horse, would it not? A. He would have control enough to stop him. Q. He could do that if his horse was running away? A. No, sir. Q. You could not do that if the horse was going four or six miles an hour? A.

You can stop pretty quick with a one-horse wagon especially.''

I. The foregoing statement is a brief resume of the evidence introduced at the trial of this cause as disclosed by the record; and upon that showing counsel for appellant insist that it did not make out a prima facie case for the jury; that for that reason the trial court properly announced that it would sustain a demurrer to the evidence.

In the consideration of the demurrer to the evidence, it should not be forgotten that the function of a demurrer ''is to admit as true all the facts which the evidence tends to prove, as well as all reasonable deductions which may be naturally drawn therefrom.'' [Meily v. Railroad, 215 Mo. l. c. 584; Kinlen v. Railroad, 216 Mo. l. c. 155.]

The evidence tended to show that the respondent alighted from the street car on Southwest boulevard about seventy-five feet west of Summit street, and, after looking for approaching vehicles, started northwest across the boulevard to the north side thereof for the purpose of taking passage on the Summit street car line; that when she had reached a point a few feet north of the north track of the boulevard line, appellant's servant, in charge of his horse and wagon, in a half intoxicated condition, with whip raised up in the air, came driving down the boulevard, as some of the witnesses said, in a ''brisk trot,'' while others said in a ''fast run,'' and ran his horse against respondent, knocked her down and inflicted the injuries of which she complains. The evidence also tended to show that when he was within a few feet of her, without attempting to stop the horse, he holloed at her, ''Get out of the way there;'' and that not until the horse was right upon her did the driver make any attempt to stop or slacken the speed of the horse. In addition, the evidence tended to show that the street on which she was injured was one of the principal thoroughfares of Kan-

sas City, upon and along which there was a great deal
of travel in street cars, vehicles and on foot; also that
the same horse and wagon almost ran over one of the
witnesses in the case, and would have done so had he
not placed his hand against the horse and pushed him-
self back out of the way; but in doing so the high speed
of the horse knocked him back with such force as to
make him fall to his knees.

If we apply the rule previously announced to the
evidence in this case, then there can be no doubt but
what respondent made out a prima facie case for the
jury; and that the court erred in compelling her to take
a nonsuit, and for that reason the court very properly
set aside the nonsuit and granted her a new trial.

II. The next and final insistence made by counsel
for appellant is, that the evidence shows respondent
was guilty of such contributory negligence as should
preclude a recovery in this case; and that the trial
court for that reason properly compelled her to take a
nonsuit.

We are unable to lend our assent to that insist-
ence. The evidence shows that she alighted from the
car, looked for approaching vehicles, and started across
to the north side of the street, and while so proceeding
she was run over and injured. While there is some
evidence from which it might be inferred that she was
not constantly looking out for vehicles while walking
across the street, however, under the law of this State,
that is not absolutely necessary. If she looked when
she started across the street and saw no approaching
danger, then the court should not have declared as a
matter of law that she was guilty of such negligence as
would preclude a recovery, simply because she did not
constantly keep up a vigilant watch.

The case of Thompson v. Livery Co., 214 Mo. 487,
was not as strong a case as the one at bar, yet in that
case this court held that the evidence made a case for
the jury. There the plaintiff not only looked for ap-

proaching teams, but actually saw the defendant's carriage about a half block away rapidly approaching the crossing, upon which she and others were standing, waiting for a street car. There was, as here, evidence which tended to show that the plaintiff did not keep a continuous lookout for the carriage, but supposed, and relied upon the supposition, that the driver thereof would slacken the speed of the team before reaching the crossing upon which, as before stated, there were several persons standing, including the plaintiff, awaiting the arrival of a street car; but instead of stopping or slackening the speed of the team, the driver there, as here, drove right into the crowd, and knocked plaintiff down, and drove against someone else, and a third narrowly escaped being trampled under the feet of the horses by jumping into the front end of the approaching car. In the case at bar the respondent did not see the horse and wagon, and, consequently, she was not required to exercise as great a decree of care for her safety as if she had seen them approaching her.

All the law required of her was that she exercise ordinary care under the circumstances; and what was ordinary care was a question of fact for the jury. [Thompson v. Livery Co., supra, l. c. 497, 498; Kinlen v. Railway Co., supra.] In discussing this question in the latter case, this court, at page 155, said: "The streets of our cities are public thoroughfares upon which all have the right to travel, but neither the pedestrian, the street car, nor the carriage drawn by horses, has the exclusive right to the use thereof. Their rights and duties are relative, and all must exercise reasonable care in order not to injure each other. While a motorman in charge of a car is not necessarily required to stop his car every time a man, horse or vehicle crosses in front of him, yet in populous cities where the streets are crowded with people, ordinary care requires him to keep a vigilant watch for those who, for any cause, are exposed to the danger of being

struck by the approaching car. And when the motorman saw or by the exercise of ordinary care could have seen Mr. Kinlen's buggy hanging to and sliding along the rail, the law imposed the duty upon him to use reasonable care to stop the car or slacken the speed thereof, and thereby avoid striking him, and whether he did or not was a question for the jury to determine.'' The same rule applies to a driver of a team upon the streets of a populous city.

After a careful consideration of the evidence, we are clearly of the opinion that the court erred in compelling the respondent to take a nonsuit, and that it properly set it aside and granted her a new trial.

For the reason before stated, we are of the opinion that the judgment should be affirmed; and it is so ordered. All concur.